[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter was commenced by the plaintiff's complaint CT Page 8992 dated January 29, 1993. Thereafter there were various pleadings filed until July 14, 1994 when the plaintiff David Murphy filed an amended complaint and the defendant, Charles A. Buonato, Jr. filed an answer to said amended complaint. This matter involved a "Chow Dog" owned by the defendant who allegedly bit the plaintiff when the latter was caring for the dog while the defendant was in the State of Oklahoma.
The plaintiff and defendant grew up together and have known each other and been friends since grammar school. In October 1992 the defendant had to go to the State of Oklahoma on business and the plaintiff agreed to care for the defendant's "Chow" dog while the plaintiff was out of state. On October 21, 1992 at approximately 10:00 p.m. the defendant went to the plaintiff's house to deliver the dog into the plaintiff's care. The defendant gave the plaintiff a chain about forty-five feet long and food for the dog and he also instructed Mr. Murphy on feeding and watering the dog. The plaintiff testified that the defendant instructed him to tie up the dog so that it would not get away.
On Saturday October 17, 1992 at approximately 9:30 a.m., the defendant was just getting up when he heard his dog barking in his yard. He looked out of his window and he saw his dog chasing a raccoon. He immediately grabbed a loaded shotgun from his wall and went out and shot and killed the raccoon. He then called the Middlebury Police who came to his home and removed the raccoon. (Exhibit A). The Middlebury Police had the raccoon tested and it was found to be rabid (Exhibit B). This information was received by the Middlebury Police Department on October 20, 1992. On that date the said police informed the defendant's fiancee that the raccoon was rabid.
On the night of October 21, 1994 the plaintiff's caring for the dog was uneventful. The plaintiff lived with a roommate who was also going to help care for the dog. On the morning of October 22, 1994 the plaintiff walked the dog for a while before going to work. When he went to work he put the dog inside the house. The plaintiff got home from work that day, October 22, 1992, about 5:00 p.m. He put the dog outside and tied him to a tree. At approximately 7:30 p.m. that night he went out and untied the dog to bring him into the house. He was holding the dog by the collar with his left hand and walking him toward the house. Initially the dog was on the left side of the plaintiff but somehow he eventually got to the plaintiff's right side so CT Page 8993 that the plaintiff's left arm was across his body holding the dog. The plaintiff reached for the door knob and as he did, the dog bit him on the left hand between the thumb and first finger. The plaintiff testified that the dog's teeth went completely through his left hand. He testified that when this occurred, the dog was squirming and he had to pull his hand away from it. Mr. Murphy testified that he ran into the house and rinsed off the wound which was bleeding but it continued to do so. He then called a friend who was not home, the defendant's brother Stephen Buonato, and his parents who came to his home immediately. The plaintiff's mother testified that she lived five miles from the plaintiff and that while she was at the plaintiff's house no one else was present. She testified she was only at the plaintiff's house five or ten minutes before she took the plaintiff to the hospital. Stephen Buonato, the defendant's brother, testified that when the plaintiff was bitten by the dog, the plaintiff called him. Mr. Buonato testified he immediately locked up his office and went to the plaintiff's home. He stated at first the plaintiff did not want to go to the hospital. He also stated that the plaintiff's mother arrived at the plaintiff's home one half-hour after he (Mr. Buonato) arrived. The plaintiff testified Stephen Buonato and his girlfriend did not arrive at his house before his mother, but they could have arrived just as he was going to the hospital.
At the Waterbury Hospital Emergency Room when the plaintiff explained to the attending doctor (Doctor Branson) what occurred and the history of the dog and the raccoon, he was warned that rabies becomes fatal in a matter of days to a week. (Exhibit D) However, at that time the plaintiff resisted any rabies treatment feeling that it was unnecessary. The defendant testified that he took his dog to the veterinarian immediately after the incident with the raccoon. The dog was examined and no evidence was found that it had any contact with the raccoon. The defendant's wife testified that it was not necessary to give the dog a rabies shot because the dog's shots were up to date. However, she was so upset the veterinarian gave the dog a rabies boaster shot. When the plaintiff went home after being treated at the hospital, he called the defendant in Oklahoma and told him what had happened. The defendant told the plaintiff to get the rabies shots if he wanted and he would pay for them.
The plaintiff testified that he did not go to work on Friday and Saturday October 23rd and October 24th. He said he CT Page 8994 spoke to the veterinarian who treated the defendant's dog and that he did not feel as strongly as Doctor Branson about him (plaintiff) getting the rabies shots but he said if he (plaintiff) had any questions, he should get said shots. Mr. Murphy said at this time he was extremely worried about the possibility he could get rabies so much so that he could not sleep at night. On Sunday, October 25, 1992 the plaintiff first learned that the raccoon was positively rabid. He then made up his mind to get the rabies shots. He testified one of the reasons he did not want to get them was because he was afraid of the shots. He testified on Monday, October 26, 1992 he received his first rabies shots which consisted of three shots. He then had follow-up shots on October 29, 1992, November 2, 1992, November 9, 1992 and November 23, 1992. See Exhibits E, F, G, H and I. He stated that after he received each of these shots, he had flu-like symptoms for thirty-six hours. The plaintiff did not contact rabies.
At the time of the incident, the plaintiff was a truck driver for a nursery. Today he works at Woodbury Auto Salvage. His job requires him to do a lot of heavy lifting.
The plaintiff claims that he has a scar on his left hand as a result of this incident and an injury to his elbow. He testified that his elbow has persistent pain. He first mentioned an elbow injury relative to this matter when he went to the Waterbury Hospital Emergency Room for a rabies shot on November 2, 1992. (Exhibit G). He testified that at the Waterbury Hospital Emergency room he was told to see an orthopedic doctor if the pain did not go away. When the pain did not go away, he went to the Waterbury Hospital Health Center on January 11, 1993 where they gave him some pills and an ace bandage to wear. While the pain did not go away he still continued to work. He testified that on some days the pain was constant until he fell asleep at night while on other days the pain ceased when he stopped work.
The plaintiff was treated by Doctor Robert W. Harkins on November 22, 1993 and February 1, 1994 for pain in the elbow. Doctor Harkins testified that the plaintiff had epicondylitis in the left elbow, better known as tennis elbow. This involved the ligaments more than the tendons. Doctor Harkins testified that there was a foreign object in the plaintiff's left elbow which was not present in January, 1993 but was on November 22, 1993 when he first examined him. This apparently was the result of CT Page 8995 a shooting practice incident when the plaintiff was hit with a bullet fragment that had ricocheted off some object and hit him. Doctor Harkins said this foreign object in his left elbow could not cause "tennis elbow". The plaintiff stated that he never had a problem with his left elbow before this incident with the dog. Doctor Harkins treated the plaintiff's elbow problem with an anti-inflammatory medicine. Doctor Harkins stated his medical opinion of the plaintiff's injury was based on the medical history the plaintiff gave him. Doctor Harkins testified that it was his opinion with reasonable medical certainty that the injury to the plaintiff's left elbow was caused by the dog bite he received on October 2, 1992. Doctor Harkins stated the plaintiff had a permanent injury with a ten (10%) percent impairment of the left upper extremity which translated into a five (5%) percent permanent impairment of the whole body using the American Medical Association Chart (Exhibit K). Doctor Harkins last saw the plaintiff on February 7, 1994 for his left elbow injury. He advised the plaintiff to make a follow up visit in three months unless he had problem sooner. The plaintiff never made a follow up appointment with Doctor Harkins.
The defendant had the plaintiff examined by Doctor Steven R. McCoy for his left elbow injury. His report was submitted into evidence as Exhibit L. This report states that the plaintiff is suffering from lateral epicondylitis which is in his opinion related to the dog bite of October 22, 1992 provided the bullet fragment in his left elbow became lodged therein after the dog bite. Doctor McCoy's report stated if the bullet would have pre-existed the dog bite, then that would raise questions as to a contributing role for his current pain. Doctor McCoy gives the plaintiff a five (5%) percent permanent partial disability to the arm as a result of this injury to his left elbow. (Exhibit L).
The parties stipulated that the plaintiff is now twenty-eight (28) years of age with a life expectancy of 46.3 years. The plaintiff's medical bills total $2,770.52. The parties stipulated that of that amount the defendant has paid $2,354.90 leaving a balance not paid of $415.62.
The defendant called Doctor Julian Bader as a witness. Doctor Bader administered the rabies shots to the plaintiff on November 9, 1992 and November 23, 1992. Doctor Bader testified that from the notes he made on the plaintiff it was his CT Page 8996 understanding that the plaintiff had "tennis elbow" prior to the dog bite.
The plaintiff is proceeding under Connecticut General Statutes § 22-357 which reads as follows:
 Sec. 22-357. Damage to person or property. If any dog does any damage to either the body or property of any person, the owner or keeper, or, if the owner or keeper is a minor, the parent or guardian of such minor, shall be liable for such damage, except when such damage has been occasioned to the body or property of a person who, at the time such damage was sustained, was committing a trespass or other tort, or was teasing, tormenting or abusing such dog. If a minor, on whose behalf an action under this section is brought, was under seven years of age at the time the damage was done, it shall be presumed that such minor was not committing a trespass or other tort, or teasing, tormenting or abusing such dog, and the burden of proof thereof shall be upon the defendant in such action.
The defendant argues that the plaintiff is a keeper under this statute and that this statute never intended to afford a remedy to an owner or keeper. A keeper of a dog is defined as "any person, other than the owner, harboring, or having in his possession any dog. Falby v. Zarembski, 221 Conn. 14, 19, (1992). In another case, it is stated that merely by shifting possession of his dog to a temporary keeper, the owner should not also be able to shift to that keeper his liability for injuries caused by his dog. Maccarone v. Hawley, 7 Conn. App. 19,25. This shows that the Connecticut Appellate Court does not find a "keeper" and an "owner" when it refers to dogs to be the same.
In this case, it would be manifestly unfair in this court's opinion to hold that the plaintiff as a "keeper" of a dog could not recover from the defendant owner for injuries to the plaintiff caused by that dog. Webster's Third New International Dictionary, defines the verb "to harbor" as to afford lodging to, to shelter, to give refuge to. Buturla v. St. Onge, 9 Conn. App. 495,497. . . . . Words and Phrases and Corpus Juris Secundum define "harborer" somewhat differently. Both refer to the case of Markwood v. McBrom, 110 Wash. 208, 211 188 P. 521 (1920) and CT Page 8997 state that a harborer of a dog is one who treats a dog as living in his home and undertakes to control the dog's actions. Ibid.
After hearing the evidence, the court finds the issues for the plaintiff on the amended complaint. The plaintiff's medical bills total $2,770.52, most of which are attributable to the series of rabies shots that he received. He also claims to have lost twenty-two (22) hours from work at $9.00 per hour or $198.00. The court finds that the plaintiff has suffered a permanent injury of ten (10%) percent impairment of the left upper extremity as a result of the dog bite he suffered on October 22, 1994. The court awards the plaintiff recoverable economic damages of $613.62 ($2,770.52 less $2,354.90 plus $198.00). The court further awards the plaintiff noneconomic damages of Thirty-Two Thousand Five Hundred ($32,500.00) Dollars or total damages of $33,113.62 plus costs. Included in the costs is the testimony fee of Dr. Harkins for three and one half hours or $1,050.00. At the conclusion of the plaintiff's case, the defendant made a motion for a directed verdict and the court reserved decision on said motion. The court hereby denies that motion.
Judgment may enter accordingly.
WILLIAM J. SULLIVAN, J.